Good morning, your honors. May it please the court. My name is Cori Endo, and I represent Mr. Garnett in this matter. Before James Garnett's trial, the state held out an inducement to its key witness, Christine Stafford. Or as Ms. Stafford described it at the evidentiary hearing, a carrot was dangled in front of her by the prosecutors. But when was that carrot dangled? It's my understanding that at the time the recordings were made, she didn't know anything about it. That's correct, your honor, and that's consistent with Judge Peckman's finding. Okay. It was during the preparation hearings for the testimony at Mr. Garnett's trial that the prosecutor, Karen Calhoun-Wells, first told Ms. Garnett about the reward. She told her they were considering her for the reward. So just to get this order of events, she's in jail lockup with this woman. They strike up this relationship. They hook up afterwards. They have these conversations. She then goes, the witness then goes to the authorities, correct? Yes, your honor. Based on already what she's heard from Mrs. Garnett, and then she comes back and does the wire, correct? Correct. The detectives convince her to wear a wire, which she does. Based on what she's already told them. Correct. Prior to the reward, which is a downstream event. Yes, it was not until the eve of Mr. Garnett's trial or the preparation sessions when they were working with her. The prosecutors were very concerned about Ms. Stafford staying sober throughout the trial, and they were meeting with her several times a week. So if that's the case and the tape recordings themselves are then going to come into evidence, why did the district court err in concluding that even though there may have been a Brady violation, well, I guess there wouldn't be a Brady violation if it's not material. And so the question is how would this have changed the outcome if the jury would otherwise have heard the tapes? Well, the district court erred because its ruling depended upon its finding that the only evidence that Ms. Stafford provided that directly incriminated Mr. Garnett was contained on those tapes. But her testimony was actually much more extensive than that. It was Ms. Stafford who testified. We were talking about the murder of Dan DiIorio. We weren't talking about a movie. We weren't talking about a what-if. We were talking about the murder of Dan DiIorio. But all that testimony was testimony about the recorded conversation, right? Correct, Your Honor. That's all it was. The recorded conversations themselves did not describe the murder of Dan DiIorio. It was about disposing of some clothes behind a laundromat. It was the laundromat statement and then the shoplifting of a taser. Well, let's say you could take that out. You were talking about the murder of Dan DiIorio. Isn't that right? Correct. Let's say you could take out the gist of that testimony. There's no doubt that the tapes would come in, correct? I believe they would. Just bald tapes. Correct. Okay. If you just took out this testimony and then you added, you know, Mr. Garnett's comments in prison, the other witnesses, the fact of the bloody clothes being talked about with the wife, et cetera, why would this be material? I think we see it both in the prosecutor's closing argument. He continually repeats, we're talking about the murder of Dan DiIorio here. We're talking about September 14th. We're talking about the night Mr. DiIorio disappeared. And that would not have been possible without the testimony of Ms. Decker. But Kimberly references the name Dan on the tape. With regard to the taser statement, certainly. Right. So why wouldn't the jury link the circumstantial evidence? Well, there was no evidence that a taser was ever used against Mr. DiIorio. No, no, no, no. My question is Dan. Forget about the taser. We're talking about Dan, blood, bloody clothes. Dan was never mentioned in the laundromat statement, Your Honor. That statement simply talked about the disposal of the clothes. I thought there was something about Dan being a big boy. That was with regard to the taser statement. In that statement, they do reference Dan. They talk about Leroy. But there's no connection between that and the murder, either in the statement itself or in the evidence. If you just had the tape, I would agree with you. But the problem is that I think the correct analysis is that the district court has to consider the entire record. And there were 48 other witnesses who testified. There was forensic evidence. There was autopsy results. Well, there was no forensic evidence that tied Mr. Garnett to the murder. There was evidence about the gun, but not direct evidence. There was evidence of his being linked, that that gun was believed to be the murder weapon. Josh Rhodes had testified that a gun that was of a similar make had been stolen. Correct. And then your client's admission to the neighbor at the jail when she tells him about the gun. Well, he did not make an admission. He panicked. It's over? He puts his head on the desk? Okay. Mr. Garnett at the time was a methamphetamine user. He was under suspicion for this murder, and he's clearly panicked. He's hiding in the closet. He's making these statements. But I don't think that this is proof. But the murder weapon is a .25 caliber, and they don't need Christine Safford Anderson to tie him to the gun. The murder weapon was never recovered, though. But there's circumstantial evidence that the neighbor possessed one that went missing shortly before the murder. There's circumstantial evidence. I think one way where we can really see the effect of this evidence is in Christine Garnett, Kimberly Garnett's third trial when this evidence finally came forward, when it was finally revealed that, in fact, Ms. Stafford had received this benefit. And the jury in that case hung. But it's a different case. Certainly it's a different case. It's a hugely different case because you don't have the husband. It's just a hugely different case, and I agree that it's arguably had an effect there. But I was puzzling over how that, in effect, kind of related backward to his case. What was the testimony in her trial about the promises that the prosecutor made to Stafford? In the third trial, it came out that she had received the reward because by that time she had actually been paid the reward and that they had discussed it prior to her testimony. But she already had a hung. She got a hung jury the first time. The first trial. Without that testimony. And then she got convicted, and then she got a hung jury. So it's hard to know, hung and hung, what to make of those. So I was just having some trouble. Maybe you can put more light on why the other evidence against her is parallel to her husband. But I didn't see that as critical. Maybe you can help me out on that, if you could answer that question. I think both cases were based on circumstantial evidence. In both cases there was this argument about a financial motive. And in the Washington Court of Appeals decision reversing her conviction after the second trial, the court recognized that there really wasn't that much evidence of a robbery, that there was no evidence that they'd come into a significant amount of money that Mr. DiIorio was believed to have. What about the money orders, paying the landlord in cash? I mean, all of a sudden he's got a lot of money. There's the $600 that he has on September 14th, but there's no evidence that there's actually any other money that he's come into. He's not spending thousands of dollars like Mr. DiIorio was believed to have had. And by the next month he's again paying his rent late. There's actually evidence that they were able to continue to pawn items. And Mr. Garnett's own mother testified that she had given him that money for the rent. Well, I want to go back a little bit now. Obviously this testimony, I'll call it the Brady evidence, must have been material in the Kimberly-Garnett trial, right? Because we can assume it influenced the jury. But as Judge McEwen says, this is a different case. There's a lot more other evidence, direct and circumstantial. And basically what Stafford did was, in a sense, to authenticate those tapes, right? And not too much more. She provided the critical context. And in that way I think this case is similar to the situation that the court addressed in United States v. Coring, where in that case it was videotape evidence, but there were these videotapes that were being interpreted by a witness. The witness was giving context to what happened on those tapes. And in that case the court found that questions about that witness's credibility, who was simply testifying about what was happening on these tapes, mattered. That it undermined confidence in the jury verdict. But if Stafford were a direct witness who had implicated Garnett in the murder, I was there, I saw him shoot, I think you'd have a much stronger case. I'm having a hard time understanding why Judge Tshishima's question is not correct, that really all Stafford did was to lay the foundation for the admissibility of the tapes. And once the tapes were in, I mean, the jury has a lot of other evidence from which it can conclude that Kimberly must have been talking about rendering criminal assistance to her husband on the night of the murder. He'd been seen with the victim drinking at the bar shortly before the victim disappeared. There's certainly other circumstantial evidence. But where I disagree with Your Honor is that the statements themselves are in no way linked to the murder of Mr. DiIorio without Kimberly's testimony, and it's because of that that the confidence... What you say in no way linked, but this is a very circumstantial case. I mean, they're seen at the tavern. The body is found a 10-minute drive from the tavern. Garnett is familiar with that particular area. It's not far from the home of someone that he frequently visits. You've got the testimony with regard to the .25 caliber missing from the neighbor's house. The bullet wounds are .25 caliber bullet wounds. So I don't think it's accurate to say that the only way that they could link James Garnett to Dan's murder was through Christine's testimony. No, and I'm sorry if that's what I said. My point is that the only way to tie those statements, the laundromat statement and the taser statement, to the murder of Mr. DiIorio is through the testimony of Kimberly. Without Kimberly's testimony, those are just these statements in a vacuum. Well, the other question I have then is it's impeachment evidence, the fact that the reward wasn't disclosed, correct? It's impeachment evidence. But you already have her impeached six ways sideways with her drug use, her convictions, and she did get a benefit that they were going to quash the subpoena. So she's already, to the extent there's an argument that she's in the pocket of the prosecutor, that's already been made, hasn't it? This may be additional information, but she's already been potentially impeached by that. What is your response? That it's not cumulative because this is an entirely distinct ground. And similar again to Coring and other cases where this court has found, even though a witness has been impeached on many grounds, there are certain types of evidence that because it's a new ground, it's not considered cumulative. And here the financial motivation for Ms. Stafford, who was in dire financial straits at the time, was a different kind of ground. It would have had a different effect on the jury. Now, the reward was public knowledge, correct? Correct, Your Honor. And there's no question the defense could have asked her about that reward, correct? They could have asked her about that, but at the time that she was interviewed, it was already in the middle of trial, and they were under the belief, and the correct belief, the fair belief, that if she had been made any promises, that they would have disclosed that information already as they were required to by both the court's order and their discovery obligations. They interviewed her before she testified, did they not? Just before she testified. They could have asked her that. Never asked her in the interview, are you aware that there's a $5,000 reward? No, Your Honor, and as Mr. Sider testified during the evidentiary hearing, he didn't ask about that in part because he didn't think it was an issue, given the timing of the interview. He believed that if they had made a promise, that would have been revealed to him prior to trial. And the second point is that during that interview, Ms. Calhoun-Wells actually interrupted and suggested that the only benefits she was receiving were the quashed warrants. I see I have one. We want to wait and save the remainder of your time. Thank you, Your Honor. May it please the Court. My name is Paul Weiser. I'm Assistant Attorney General, appearing on behalf of Appellee Morgan in this case. There's no evidence that the prosecutor suppressed any impeachment evidence in this case, but more importantly, Christine Stafford's testimony was not central to the State's case. I thought there was testimony that, in essence, she was told in a pretrial prep, don't volunteer anything, which she testified she took to mean don't tell them about the reward unless I'm directly asked. I think that's correct, Your Honor. I think that that was the supposition that Ms. Stafford made. So whether it was a miscommunication or sort of a subtle wink, wink, don't let this cat out of the bag. We can't really tell from the record. Your Honor, I think the testimony was that the State gave that as a standard instruction, just as attorneys often do before a witness undergoes a deposition or is to testify at trial, just don't volunteer information. Answer the question that's posed to you. Well, wasn't there something else said that? Well, let me ask you this. What led to her understanding that, you know, testifying favorably to the State would help her in getting the reward? Where did that come from? Your Honor, it's our belief that that just came from Ms. Stafford's understanding of what could happen to her. I don't think there's any testimony that the State told her, this is a quid pro quo. You do well. You testify well. Well, there was no suggestion about if you testify, if you do a good job of testifying, you know, you'll enhance your chance of getting the reward or anything like that? I don't think there was any testimony to indicate that at all, Your Honor. Well, was she told that by some State representative that the State can make a recommendation as to whether you should get the reward or not? I don't know that the testimony was clear enough on that point to be able to respond to the question. I think that the testimony was, and we have to understand there were two different types of testimony. We had the prosecutor saying, we don't recall ever discussing the reward with her. If it did come up, at most we would have said you will be considered for that, not making any promises. I think Ms. Stafford had a different understanding or a different take on that dynamic or on those discussions. But while we don't concede that there was any suppression involved in this case, even if there was suppression of any impeachment of Ms. Stafford based upon the reward, it was simply not material under the Brady standard. As the Supreme Court reminded us in Strickler v. Green, strictly speaking, there is never a real Brady violation unless the nondisclosure was so serious that there was a reasonable probability of a different outcome or that the suppressed evidence would have produced a different verdict. With respect, Stafford was not a key witness for the State. She was just one of 49 States' witnesses, and the body wire tapes were far more important than anything she testified to. She had no firsthand knowledge about the crime, and in fact was not an eyewitness to anything. She didn't even know Garnett and had never met him. The only inculpatory information she provided was on the tapes, and her exclusive role at the trial was to get those tapes into evidence. The prosecutors both testified at the evidentiary hearing that had those tapes been ruled inadmissible, just those two snippets that were placed into evidence during the Stafford's testimony, had that evidence been ruled admissible, there would have been no reason at all to call her as a witness. So the only reason she was put on the stand was to get the tapes into evidence. What do we do with Ms. Calhoun-Wells' acknowledgement that she wasn't certain that without Christine Stafford they would have been able to convict? I think, Your Honor, that she may have been talking about the global case against the Garnetts, both of the Garnetts, and the fact that she felt that Ms. Stafford was an important witness from the State's perspective, or at least the evidence that she provided was important from the State's perspective. I don't believe that she was suggesting that without Ms. Stafford this was a whodunit. It was unclear who. Although without her explanatory testimony, the tapes or the wire transcripts themselves don't talk about any particular person, correct, in terms of a victim or a murder? It's correct in part, Your Honor. I believe the one statement, the laundromat statement, that's the shorter of the two. It's at excerpt of Record 389. It doesn't contain the victim's name. It just says that James came home after a short period of time and he had the bloody clothing and that she disposed of them. The taser statement, though, does use the word Dan. It talks about Dan being a big boy, being kind of strong, while we had a stun gun that we used to, or the suggestion is made on that tape that the stun gun was somehow used to subdue Mr. D'Orio in the crime. So there is a specific mention of the name Dan. So I think that that one does identify or is directly tied to the facts of the crime. And it's undisputed that the tapes were made long before Ms. Stafford even became aware of the reward. The tapes were made in December of 1999 and I think that all sides agree that if she was advised of the outstanding nature of the reward from the state court, she would have been able to get the reward of $3,000 at the time of Mr. Garnett's trial. Could I ask you something that troubles me about the procedural history? And this is this intersection of this case with Pinholster and others. And I've spent hours trying to unravel it. So let me just ask you this. I find it hard to accept your characterization that the state court considered this claim because the state court, of course, considered a Brady claim but didn't have anything to do with this. And why one would give deference to something that doesn't exist makes no sense to me. And maybe you can enlighten me on why you take that position. Your Honor, earlier in the case I took the position this was an entirely new claim. The allegations surrounding the reward and there was also, there were other allegations too. There were allegations concerning whether Ms. Garnett had made concessions on other felony crimes in Skagit County and also whether she was afforded the opportunity not to be extradited for several months, staying in Skagit County rather than being shipped off to Montana. Those later dropped out and it was just the reward that was still present. No, that was not presented to the state court. I argued that it was an entirely new claim that was being raised. And Mr. Garnett came back and said in his motions for discovery, which are in the supplemental excerpts of record, as well as his motion to supplement the record, this is all the same. This is part of his Brady claim that he raised in state court. It's nothing new. It's just some, maybe some new evidence that amplifies or supports the claim that he had previously raised about governmental mismanagement and failing to disclose. So basically to just get to the bottom of it, you then cave to that characterization. I mean, is that the government's position that it's the same claim? No, Your Honor. I never, never caved to that description, but maybe I was a little too colloquial in my view. But so what, what is the government's position that this is a new claim or that it's the same claim that was adjudicated? It's our position it's a new claim. The district court erred by not dismissing it as a mixed petition. If it's a new claim, if it's a new claim, then it wouldn't have been exhausted, correct? That's correct, Your Honor. I, I thought it was more productive to address the merits of Mr. Garnett's Brady claim rather than getting bogged down in the procedural niceties that get involved in exhaustion and procedural default. Plus that issue had not been briefed to this court. But I would point out that the state has never affirmatively waived the exhaustion defense in this case under section 2254 B3. So we, we believe that that issue is still potentially a live one, but I don't believe that the court needs to address that because the court can simply go on the merits of this case and address the Stafford impeachment evidence for its lack of materiality. I would point out that as the court indicated earlier, Stafford was thoroughly impeached at trial. And in fact, that was the bulk of her 42 pages of testimony was describing her life as a drug addict and her use of drugs during the time that the body wire tapes were, were in place and her many criminal offenses, many of which involve crimes of dishonesty and the state later characterizing her as a junkie in closing argument. I might just add, it would probably save this court a lot of time if the state were to take the jump to the merits. But the position you took in your brief, as I recall, is that this, the Brady claim had actually been adjudicated on the merits. And to a degree that sends us off on a wild goose chase, a procedural goose chase, if you will, trying to figure out what does that mean? Where is this case? What's the standard of review? Where does pinholster come in? So, I mean, I appreciate that. In fact, it makes much more common sense to just adjudicate the claim and to argue the merits. But by taking the position it did, then you get us into this debate between you and Mr. Garnett's counsel about the standard of review, which could make a difference. I don't know if it will make a difference here or not, but in some cases it makes a difference. Does it not? Yes, Your Honor. Garnett insisted that this was not a new claim. It was part and parcel of the claim that he raised in state court. So that's what I used as the basis for arguing that Cullen v. Pinholster does have some application in this case. As I stated, this was not a whodunit in the absence of Christine Stafford. We know that Mr. Garnett was with the victim, Dan DiOrio, on this September 14th. In fact, he acknowledged he was with him that evening. And he was, in effect, the last person to see Mr. DiOrio alive. When Mr. DiOrio's body was discovered several weeks later, when it was discovered in that shallow grave, the thousands of dollars that he customarily carried with him, that big wad of cash that he was so proud of flashing to the public, that was missing. And suddenly we know that Mr. Garnett has $600 worth of cash, or at least $600 worth of cash, on him at 7.56 p.m. on September 14th, 1999, when he went to buy two $600 money orders at the nearby grocery store. This, despite the fact that he was unemployed and that he had been shut out on all of the pawning activities that he and his wife were so fond of. And those money orders were purchased in the same shopping center that the laundromat is in where the clothes were supposedly dumped. It's my belief that that's the case, Your Honor. That's what I read in the record. Did I read that correctly? I think that's correct. It's the same grocery store that people commonly went to. Among other things, they sold money orders. Would you address the argument that the wife's third case ends in a hung jury, and in that case you have this additional impeachment evidence as to what effect, if any, that has on our analysis of the materiality? Yes. Well, Your Honor, the cases against Mr. Garnett and Mrs. Garnett were very different. Kimberly Garnett was never accused of being physically present at the time of the crime. It was alleged that she had foreknowledge and, in fact, had helped in the planning of the murder, and that also that she rendered criminal assistance afterwards by, for example, disposing of the bloody clothing. That this was, in other words, a plan involving both of them. A lot of that rested upon Christine Stafford and others. The admissions that Mrs. Garnett had made to Christine Stafford and others, rather than circumstantial evidence placing her at the scene, as was the case with Mr. Garnett. So I think Mrs.  Garnett's trial than she did in James Garnett's trial. And, in fact, that's borne out by the fact that I think there were 16 or 18, or not that many. I think it was eight or nine passages from the body wire tapes were admitted at Mrs. Garnett's trial, whereas only those two were admitted at Mr. Garnett's trial. So the evidence was very different. Obviously, different juries, different attorneys, and it did result in two hung juries out of the three trials she ultimately pled guilty to a lesser charge and served a prison sentence. But there was a statement made during opposing counsel's argument about Ms. Calhoun interrupting and preventing the defense from finding out about the reward. I just can't let that go unaddressed. That was actually, and it's reflected in defense counsel's notes and it's reflected in the testimony of Lana Stevenson at the evidentiary hearing. The defense never asked about benefits. They were asking specifically about what the prosecution was doing about warrants. And I'm sure that Ms. Stafford probably had little idea what warrants were outstanding and what the prosecution did with respect to those. Ms. Calhoun answered by saying that they had quashed a number of warrants. That's what it was. She didn't interfere and prevent the defense from discovering or asking questions about the reward. And the question that had been posed to Ms. Stafford was not anything that had to do with benefits generally. If there are no further questions, we'd ask that the court affirm the district court's decision. Thank you. Thank you. Thank you. If Ms. Stafford's testimony was not important, if her credibility was not important, I think there are big questions about why Mr. Dhaniuk would have testified that no one had asked for the rewards. There were very careful questions asked of him, of Ms. Stafford, about what benefits she had asked for. The state argued in its closing argument that she got nothing, nothing from the prosecution and nothing from law enforcement. That was not true. And the case law supports the notion that the materiality of evidence is established in part by the way that the prosecution uses it. And when the prosecution makes misrepresentations to the jury, we need to consider that and why the prosecutor would do that, why the prosecutor would act in an unethical way if it doesn't matter. We also left wondering why Ms. Calhoun-Wells would say and stand by this at the evidentiary hearing. I thought the state of the record was that the reward didn't really come into play until after the trial was over. Wasn't there testimony from Tom, is it Verge, the prosecuting attorney, that until after the trial, he had never considered that she would be eligible for the reward or didn't want to give it to her because she was a meth addict? Certainly. But I think his change of heart after the trials further suggests that it was her testimony that was important. If she only matters for having made those recordings and helped in that regard. No, we're back to the timing problem that I'm having with your argument, and that is that it wasn't until after the trial was over that this whole reward issue came up. So if the prosecutor argued in closing that she'd never asked for the reward, that was true at that time, was it not? She had not asked for the reward. The reward had been held out to her as a possibility. And as the Supreme Court recognized in Bagley, it's that kind of contingent reward or an uncertain benefit that has an even greater coercive effect on witnesses. And accordingly, we'd ask the court to grant the writ. How was it held out to her? In other words, Mr. Weister said there was no direct statement by the witness that way? During Ms. Stafford testified that she was told about the reward. She was told that Ms. DiOrio wanted her to receive the reward, that Ms. Calhoun-Wells wanted her to receive the reward. But they weren't going to make a decision about who to recommend until after the trials of Kimberly and James Garnett. Ms. Calhoun-Wells' testimony doesn't contradict that statement. What she says is we definitely talked about the reward. I can't remember exactly what I said to her, but it was probably something along the lines of no promises, but we'll see how things go. And it's that inducement that they should have revealed to Mr. Garnett and his lawyers prior to trial. Thank you. Thank you. I'd like to thank both counsel for your argument today. And the case just argued of Garnett v. Morgan is submitted. Our last case for argument this morning is CRM Collateral v. Tri-County.
judges: Tashima, McKeown, Tallman